VILLAGE S. S. CO., Limited, v. STANDARD OIL CO. OF NEW YORK.

(District Court, S. D. New York. April 20, 1909.)

SHIPPING (§ 153*)—CARRIAGE OF GOODS—LIABILITY OF VESSEL FOR SHORT DELIVERY.

Libelant steamship company brought suit to recover a balance of freight money for the carriage of a cargo of oil in cases, which was withheld by the charterer to cover a shortage in delivery. The cargo was discharged at Whampoa, China, into lighters provided by the charterer, in which it was taken 14 miles up the river to Canton, where it was stored in warehouses. The tally on the ship was kept by Chinese tallymen employed by the captain, and showed a shortage, as did the tally at the warehouses. Libelant claimed that the whole number of cases was in fact delivered to the lighters, and the missing cases were stolen between the ship and warehouses, an incorrect and fraudulent tally having been made through collusion between the Chinese tallymen and lightermen. *Held*, that the burden rested upon it to prove such fact, and that, while the evidence established its probability, it was not sufficient to entitle libelant to recover, in view of the fact that the captain failed in his duty to have the tally taken or supervised by white men, as he could have done and was advised to do.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 153.*]

In Admiralty.

Libel by the owner of the steamship Drumgeith to recover $753.36, deducted by the charterer from freight money for an alleged shortage of 415 cases of oil upon delivery of the cargo. The vessel was chartered to carry a full cargo of case oil from New York to Whampoa, China. At Whampoa the cargo was discharged into lighters provided by the charterer, under the direction of a Chinese stevedore and tally clerks engaged by the captain of the steamship. The tally kept by them showed a shortage of 541 cases, but this afterwards, by various additions and deductions, was reduced to 415 cases. The cargo was transported in the lighters 14 miles up the river to Canton, where it was discharged into the warehouses.

Convers & Kirlin (Charles R. Hickox, of counsel), for libelant.

Wing, Putnam & Burlingham (Charles C. Burlingham, of counsel), for respondent.

HOLT, District Judge (after stating the facts as above). I think that probably the missing cases of oil were stolen after the ship arrived at Whampoa, either before or during the process of unloading, or from the lighters during their passage between the ship and the warehouse. If they were originally got off the ship into the lighters, with the intent of stealing them, pursuant to a scheme of false tallying, it may perhaps be claimed that they were stolen from the ship, although they were delivered from the ship into the lighters, and were then taken from the lighters during their passage to the warehouse. I think the probability is that the Chinese tallymen were in collusion with the Chinamen on the lighters, and intentionally made a false tally, less than the actual number of cases delivered into the lighters, and that the surplus cases were stolen on the passage to the warehouse. By this scheme the ship tally on each lot would correspond with the warehouse tally, and the loss would not appear until the entire cargo was landed. But this is a mere probability, which can-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

not be determined, on the evidence, with any certainty. The libelant's counsel states, in his brief, that there is no certainty that the number of cases named in the bill of lading was actually put on board, and it is undoubtedly the law that, while the number stated in the bill of lading is prima facie evidence of the amount shipped, in case of fraud or mistake the actual facts may be proved. But I think that the evidence is clear that the number of cases stated in the bill of lading, 149,160, was in fact taken on board the ship. The bill of lading says so without qualification. The libel alleges it to be so. Capt. Fairweather, in his testimony, admits it. The cases were tallied, before being taken on board, by what is called the "block system" of tallying, under which a number of cases were arranged so as to make a cube. By this method the number of cases in the cube can be accurately computed, and there is less danger of any mistake than where cases put on board are tallied one by one. I am satisfied, therefore, that the vessel took on board the exact number of 149,160 cases.

By the terms of the charter party, the respondent agreed to pay the libelant 20½ cents "on each and every case delivered, whether full, part full, or empty, payable upon correct delivery of cargo at the port of discharge." This suit is brought to recover the amount due for freight on the entire 149,160. The libelant, therefore, has the burden of proof to establish that it delivered that number. When the delivery was finished, the tally kept on the ship showed a shortage of over 500 cases. The libelant has given satisfactory testimony that when the delivery was completed all the cases which had been put on board were out of the ship, and has given testimony strongly tending to show that there could have been no abstraction of any cases from the ship before her arrival at Whampoa. The libelant's claim is, substantially, that the tally kept on the ship was incorrect, that all the cases were delivered, and that the cases that were actually missing on the arrival of the lighters at the warehouse were taken from the lighters on their voyage from the ship to the warehouse. But the question is, was the tally kept on shipboard in fact erroneous? The captain employed Chinese tallymen and stevedores to unload the ship. He consulted with the agent of the Standard Oil Company, and says he was recommended to take the tallymen and stevedores who had just been engaged in unloading another vessel, the Lawhill. The respondent's agent states that he simply suggested that the captain could employ the men who had just been working on the Lawhill. He expressly warned him, however, of the untrustworthiness of the Chinese, and advised him to have Europeans supervise his tally, and the captain repeatedly, in letters, announced his entire lack of confidence in the honesty of the Chinese. But the captain, admittedly, did not have the tallying done under the supervision of any European. The evidence shows that the unloading, during much of the time, went on at four or five hatches at once. There is no evidence that the captain or any of his officers kept or supervised the keeping of the tally, or exercised any efficient supervision over the work at each hatch during the unloading. The captain says, in explanation of this omission, that he had but two officers. But he had enough able seamen on board. The ship was at anchor. The men had nothing

to do, and there could have been no difficulty in his having the accuracy of the tally at each hatch supervised by trustworthy Europeans. If that had been done, I think that probably the entire 149,160 cases would have been tallied as coming out of the ship. But obviously, if a tally correctly taken had showed the shortage which appeared on the tally actually taken, the ship would be liable for it, and would not be entitled to freight except on the actual number of cases delivered. Upon the whole case, I think that the libelant, in order to maintain this action, had the burden of proving that it delivered 149,160 cases. As the tally which was taken shows a less amount, and as the claim of the libelant is that that tally was fraudulently erroneous, and as, if there were errors in that tally, either through a mistake or fraud, such errors could have been prevented by the captain, if he had attended to his fundamental duty of having an accurate and trustworthy tally kept, I do not think that the libelant has sustained the burden of proof necessary to be sustained by it in order to recover in this case.

The libel should be dismissed, with costs.